# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JASON S BROWN,

      Plaintiff

v.

DR. ADAMSON, et al.,

      Defendants

Case No.: 3:21-cv-00500-MMD-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 38, 47

      This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

      Plaintiff has filed an emergency motion and amended emergency motion for a preliminary injunction. (ECF Nos. 38, amended motion at ECF No. 47.) Defendants oppose the motions. (ECF Nos. 43, 45-1, 48, 48-1 and 48-2,  53-1, 53-2, 60-1). Plaintiff filed a reply brief. (ECF No. 50.)

      After a thorough review, it is recommended that Plaintiff's original motion be denied, but that his amended motion be granted insofar as an injunction should be issued to provide Plaintiff with medical care as detailed below.

## I. BACKGROUND

      Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. .) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC), though he is now housed at Wells Conservation Camp (WCC). (*Id.*)

The court screened Plaintiff's complaint and allowed him to proceed with an Eighth Amendment failure to protect claim against Fraley as well as an Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Adamson and Dr. Marks. (ECF No. 7.)

Plaintiff alleges that in June 2017, defendant Fraley provided general population inmates at LCC with softball bats and softballs to use during yard time. After doing so, Plaintiff claims Fraley returned to the gymnasium and left the inmates unsupervised. Plaintiff avers that the inmates began making wagers to see whether they could hit a fellow inmate with a softball, and they would win double if they knocked another inmate unconscious. As Plaintiff was walking the yard track, the inmates started hitting balls at him. Plaintiff did not realize he was being targeted, and was hit in the left side of the face with a softball. He claims he was taken to the hospital and diagnosed with a shattered left orbital, fractured jaw/cheek, concussion, and severe swelling and bruising around an indented left temple. He was placed on a liquid diet for and then had surgery.

In July 2017, he was transferred back to LCC from the hospital. He alleges that he reported to Dr. Adamson that he was experiencing blurred vision and spots in his left eye, dizziness, tremors, brain fog, nausea, and twitching on the left side of his face and body. Dr. Adamson allegedly told him this was a result of his surgery. Three weeks later, Plaintiff told Dr. Adamson his symptoms had gotten worse and he was also experiencing extreme migraines and ringing in his left ear. He was prescribed Indomethacin, but he reported to Dr. Adamson this was not relieving his pain and he had suddenly passed out twice since he started taking the medication. Dr. Adamson told him there was nothing else he could do and that he should drink more fluids and rest. In February 2018, Plaintiff told Dr. Adamson his symptoms continued. He had blurriness and floaters in his left eye, and he could barely see. Dr. Adamson told him to continue taking Indomethacin, to drink fluids and stay off his feet. He saw Dr. Adamson in 2019

regarding his ongoing symptoms. Dr. Adamson suggested that physical activity, such as working in the culinary, might help. Plaintiff claims he had five "man-downs" while working in the culinary due to passing out. Each time, Dr. Adamson told him he was imagining his symptoms and he was sent back without an exam.

In 2020, Dr. Adamson was replaced with Dr. Marks. In May 2020, Plaintiff complained to Dr. Marks of his ongoing symptoms. Dr. Marks ran tests and determined that Plaintiff had antibodies for Lyme disease, and the doctor said Plaintiff would have to wait and see how the disease progressed. In September 2020, Dr. Marks performed a spinal tap to see if Plaintiff had meningitis, but he never informed Plaintiff of the results. In November 2020, Dr. Marks prescribed medicine to help with Plaintiff's vertigo, but Plaintiff advised Dr. Marks it caused him to vomit. Dr. Marks told Plaintiff it was the only thing he could give him, and that he would schedule Plaintiff to see an ear, nose, and throat (ENT) specialist.

On October 6, 2022, the court entered an order directing the Office of the Attorney General to file a notice by October 27, 2022, advising the court and Plaintiff of the names of the Defendants for whom it can accept service, and as to any defendant(s) for whom it cannot accept service, to file the last known address under seal. (ECF No. 15.)

On October 27, 2022, the Attorney General's Office filed a notice that it was accepting service for Richard Fraley and Dr. Dana Marks. Service was not accepted for Dr. Kim Adamson, who was a former NDOC employee. (ECF No. 17.) Dr. Adamson's last known address was filed under seal. (ECF No. 18.) A summons was issued for Dr. Adamson. (ECF No. 22.) To date, there has been no return for the summons for Dr. Adamson indicating whether or not he was served. The court notes, however, that the Attorney General's Office represents Dr. Adamson in other actions pending in the District of Nevada. For example, the Attorney General's Office represents

Dr. Adamson in case 3:17-cv-00643-RCJ-CSD, which is set to go to trial on April 24, 2023. Therefore, the court directs the Attorney General's Office to immediately contact Dr. Adamson regarding this case and file a notice on or before **April 14, 2023** indicating whether it can accept service on Dr. Adamson's behalf. If it accepts service, Dr. Adamson has up to and including **April 28, 2023**, to file his responsive pleading.

In Plaintiff's first emergency motion for a preliminary injunction, Plaintiff asserts that he is in serious need of medical treatment due to worsening of his vertigo, pressure migraines, eye sensitivity, neck stiffness, and other issues due to the brain injury he suffered. He asks the court to order that he be provided with necessary medical treatment by a specialist for head trauma. (ECF No. 38.)

On January 11, 2023, the court ordered Defendants to file a response to the motion by January 23, 2023. (ECF No. 40.)

Defendants filed a response on January 23, 2023. (ECF Nos. 43, 45-1.)

On January 30, 2023, Plaintiff filed an amended emergency motion for preliminary injunction, where he requests the court order NDOC to transport him to Northern Nevada Correctional Center (NNCC)  for immediate medical treatment, including that he be seen by the neurologist contracted with NDOC, and if that doctor is unavailable, an outside neurologist, and that he receive such treatment within two weeks of his arrival at NNCC. His amended motion includes as exhibits various inmate request forms (kites) and grievances where he complained about these the symptoms at issue in this action. (ECF No. 47.)

On February 13, 2023, Defendants filed a response to the amended motion. (ECF Nos. 48, 48-1, 48-2.) They include as exhibits declarations of WCC's facilities manager, Robert

Downey, as well as NDOC's offender management administrator, Kirk Widmar. (ECF Nos. 48-1, 48-2.) No medical records were included as exhibits.

On February 23, 2023, the court issued an order noting that Defendants' response to the amended motion appeared to ignore the medical kites and grievances Plaintiff submitted indicating he has continued to complain of ongoing symptoms, to no avail, yet Defendants did not provide the court with Plaintiff's relevant medical records. As such, the court ordered Defendants to file Plaintiff's relevant medical records, medical kites, and grievances under seal, and the court directed the OAG to ensure Plaintiff is given a reasonable opportunity to review the records. The court advised that it would then determine whether to hold a hearing or issue a report and recommendation. (ECF No. 49.)

Plaintiff filed his reply brief on February 27, 2023. (ECF No. 50.)

On March 3, 2023, Defendants filed Plaintiffs medical records, kites, and grievances under seal. (ECF Nos. 53-1 to 53-2.) As Plaintiff points out (ECF No. 57), the medical records submitted by Defendants contained two pages that said Plaintiff's medical file had been "thinned." The documents appear to state that on February 15, 2022, at LCC, the file was thinned of Plaintiff's kites from October 2015 to July 2020, and of outside consultation, medical sheets, orders, notes, x-rays, labs, kites, miscellaneous, legal and unusual materials for dates ranging from October 2015 through December 2021. (ECF No. 53-1 at 20.) The thinned records would seem to contain the records relevant to Plaintiff's Eighth Amendment claim. It is not clear whether Deputy Attorney General (DAG) Laura Ginn did not review the records submitted on March 3, 2023, or whether she reviewed them, and submitted an incomplete set of records anyway. In any event, in response to Plaintiff pointing out that the records were incomplete, Ms.

Ginn filed Plaintiff's medical records, inclusive of the thinned records, on March 24, 2023. (ECF Nos. 58, 60-1.)[1]

The court will now address Plaintiff's emergency motions for injunctive relief.

## II. LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Injunctions and temporary restraining orders are governed procedurally by Federal Rule of Civil Procedure 65, but case law outlines the substantive requirements a party must satisfy to obtain an injunction or restraining order. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) ("[T]he general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional principles of equity jurisdiction.").

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant motion requires that the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public

---

[1] Curiously, the supposedly complete set of records filed on March 24, 2023, does not contain some of the records that Plaintiff submitted in connection with his briefing, suggesting that the records are not in fact complete.

interest. *Id.* at 20 (citations omitted).). The Ninth Circuit has held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support the issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (citation and quotation marks omitted).

The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must satisfy additional requirements when seeking preliminary injunctive relief against prison officials.  The PLRA provides, in relevant part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). Thus, the PLRA limits the court's power to grant preliminary injunctive relief to inmates. *See Gilmore v. People of the State of California*, 220 F.3d 987, 998 (9th Cir. 2000). "Section 3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators—no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999.

### III. DISCUSSION

**A. Emergency Status**

Plaintiff did not comply with the requirements for filing an emergency motion under Local Rule 7-4; therefore, the court has not treated his motions on an emergency basis, but has considered them instead on a non-expedited or non-emergent basis. Plaintiff is advised that

emergency motions should be rare, and in the future, any emergency motion must comply with Local Rule 7-4.

**B. Plaintiff's First Motion for a Preliminary Injunction**

Defendants are correct that Plaintiff's first motion fails to address the *Winter* factors to demonstrate he is entitled to injunctive relief. Therefore, the first motion should be denied. Nevertheless, there are issues raised in Defendants' response to the first motion that the court must address.

In his first motion, Plaintiff states that his condition has continued to worsen, and on December 1, 2022, he saw a medical provider who said nothing could be done for Plaintiff because his medical file was missing documents regarding his medical history on this condition (*i.e.,* his head injury). (ECF No. 38 at 2.)

Defendants' response states that Plaintiff saw an Ely State Prison (ESP) medical provider on December 1, 2022, complaining of cold/flu symptoms and was prescribed a cold pack, and he was not seen for his head. In addition, they argue that the provider notes do not support his claim that there were any missing records that were required for his December 1, 2022 appointment.

Defendants are correct that Plaintiff's medical records reflect that he was seen for cold/flu symptoms on December 1, 2022, and not regarding his head symptoms. (ECF No. 53-1 at 78.) Plaintiff was next seen via Zoom on December 13, 2022. At that appointment, he complained of daily headaches, pressure and throbbing in his temples, nausea, and floaters in his vision, and reported he had been hit in the head with the baseball in 2017. (ECF No. 53-1 at 77, 82.) Plaintiff clarifies in his reply brief that it was at this appointment (and not the December 1 appointment) that the doctor said there was nothing in his medical file regarding any issues with his head. (ECF No. 50 at 2.)

8

While Defendants argue there is nothing in the December medical records about missing records necessary for the appointment, Defendants did not mention the documents in Plaintiff's medical file indicating that his medical records had been "thinned" of the records concerning his head injury. Therefore, it is entirely reasonable to believe Plaintiff's representation that a provider would have commented in December 2022 that there were no records concerning Plaintiff's head injury.

In any event, Defendants' response blatantly ignores the abundance of medical kites and grievances over the years following his head injury where Plaintiff complained of headaches, migraines, tremors, dizziness, nausea, and vision issues.

Finally, Defendants argue the allegation in Plaintiff's motion of a possible brain tumor or swelling is new. The court finds this argument to be disingenuous. Plaintiff's complaint clearly alleges that he suffered a head injury that resulted in a fracture and severe swelling. The fact that Plaintiff, who is not a trained medical professional, said that he wants to see a doctor for a *possible* brain tumor of swelling, does not mean there is an insufficient nexus between his requested relief of treatment for his head injury from a specialist and the allegations in his complaint.

**C. Plaintiff's Second Motion for a Preliminary Injunction**

**1. Likelihood of Success on the Merits**

First, the court will address whether Plaintiff has a likelihood of success on the merits of his Eighth Amendment claim.

**a. Eighth Amendment Standard**

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

If the medical need is "serious," the plaintiff must show the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely

denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *Stewart v. Aranas,* 32 F.4th 1192, 1195(9th Cir. 2022) (citing *Shapley v. Nev. Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir. 1985)); *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

There is no argument that Plaintiff's alleged symptoms qualify as a serious medical need. The question, then, is whether Defendants were deliberately indifferent to his serious medical need.

### b. Plaintiff's Medical Records

Plaintiff was seen at LCC on June 21, 2018, and he reported being hit in the face with a softball while walking. He had swelling and redness to the left temple/jaw area, and was unable to open or close his mouth. (ECF No. 60-1 at 158.) Plaintiff was taken to Renown hospital, and a maxillofacial CT showed segmental fractures in the right zygoma, displaced by about five

millimeters, edema in the overlying soft tissues, and nasal septal deviation toward the right. He was instructed to follow up with plastic surgeon Dr. Scott Wyre in a week. (*Id*. at 118, 153.) Dr. Adamson ordered that Plaintiff be placed on a liquid diet for a week. (*Id*. at 110.) He was admitted to the infirmary on June 25, 2018, and on July 11, 2018, Dr. Adamson requested a consultation for facial surgery for the fracture, and Plaintiff had surgery the next day. (*Id*. at 117, 122.) He had an x-ray of the mandible on August 1, 2018, which was unremarkable, but the notes state that if concern persists, lateral views might be considered. (*Id*. at 151.) In January 2020, Plaintiff was prescribed Indocin.[2] (*Id*. at 141.)

In May 2020, Plaintiff complained of weakness, vertigo, nausea, vomiting, visual changes and being off balance for six weeks, with prominent nausea. (*Id*. at 130.) It was ordered that he should be off work for three days, and he was prescribed Antivert.[3] On June 7, 2020, he complained of vertigo, nausea, a copper taste in his mouth, and feeling like he was going to lose consciousness for four weeks. It was ordered that he could not work until released by his doctor, and he could have Phenergan[4] for nausea and was advised to drink fluids. (*Id*. at 102, 129, 140.)

Plaintiff filed an emergency grievance on June 12, 2020, stating that he "manned down" on June 7, 2020, because of his health concerns, to which medical had not responded. The grievance was denied as not being an emergency. (ECF No. 53-1 at 2-3.)

On June 24, 2020, Dr. Marks requested a consultation with an ENT for Plaintiff's vertigo, nausea, vomiting, vision issues, and occasional near syncope and decreased energy. This was

---

[2] Indocin is a nonsteroidal anti-inflammatory drug. *See* Indocin Uses, Side Effects & Warnings - Drugs.com, last visited April 6, 2023.

[3] Antivert, or meclizine, is a drug used to treat or prevent nausea, vomiting and dizziness, as well as vertigo. *See* Antivert: Uses, Dosage & Side Effects - Drugs.com, last visited April 6, 2023.

[4] Phenergan acts as an antihistamine. *See* Phenergan Uses, Dosage & Side Effects - Drugs.com, last visited April 6, 2023.

12

authorized, but there is no record indicating Plaintiff ever saw an ENT. (ECF No. 60-1 at 111, 139.)

A spinal tap was performed by Dr. Marks on August 21, 2020, though the records are not clear why this was performed, and there is no indication of the results, despite Plaintiff's request for the results and assurances that he would be scheduled to see Dr. Marks to review the results. (ECF No. 53-1 at 80; ECF No. 47 at 11, 12.)

Plaintiff initiated a grievance on November 16, 2020, recounting that he was struck by a softball in 2017 and had surgery to repair the left side of his skull. He claimed that he was not given concussion protocols or an MRI after the incident.  Since the incident, he had suffered from progressive vision loss, vertigo, dizziness, blurred/double vision and eye floaters, nausea, stiffness in his joints/limbs, fatigue, mood disorder, memory loss, and extreme headaches. He wanted to quit his culinary job, but was told he could not. He asked to see a neurologist and for a medication review. (ECF No. 53-2 at 5-6.)

Plaintiff submitted another kite to see a doctor on January 26, 2021. He was told he would be scheduled, and there is a notation that he was seen on November 15, 2021, and December 20, 2021, just shy of a year after he put in this request. (ECF No. 60-1 at 34.)

Plaintiff sent another kite on April 19, 2021, stating he has been waiting to see a doctor, and complained of his mouth tasting like metal, vertigo, tremors and blurred vision. The response again notes Plaintiff was seen in November and December 2021, which was seven to eight months after his kite. (*Id*. at 31.) He sent a kite on May 31, 2021, asking to see a doctor for his chronic vertigo, lost eyesight, tremors, numbness, headaches, nausea and pain, which were causing him to quit his kitchen job. The response similarly notes that he was seen in November

and December 2021. (*Id*. at 29.) On June 1, 2021, he submitted another grievance about his symptoms and the fact that he had continuously kited, to no avail. (ECF No. 53-2 at 15-16.)

A psychological record from July 13, 2021, includes reference to Plaintiff's report of bad vertigo. (ECF No. 53-1 at 26.) On August 12, 2021, Plaintiff submitted a first level grievance after not receiving a response to his June 2021 informal level grievance. He reiterated his symptoms and asked for treatment. (ECF No. 53-2 at 13-14.)

On September 22, 2021, Plaintiff sent a kite stating he had a migraine for two weeks and was extremely sensitive to light and motion and was very nauseous. He was referred to nursing call, and labs were recommended. (ECF No. 60-1 at 25.) Plaintiff sent another kite on October 7, 2021, stating that his symptoms were getting worse. He was dizzy, his vision was going white, he had tremors, nausea and vomiting, and days of fatigue in bed. The response states that Dr. Marks would review his kite and symptoms. (*Id*. at 24.)

Plaintiff submitted a second level grievance on October 16, 2021, after he received no response to his first level grievance, reiterating his request for treatment. (ECF No. 53-2 at 7-9.)

A psychological record dated November 9, 2021, notes that Plaintiff had vertigo, migraines, and nausea. The provider indicated Plaintiff had an ENT consult pending. (ECF No. 53-1 at 25.)

On November 13, 2021, Plaintiff sent a kite that he had a migraine for four days, extreme pressure that was causing blurred vision and ringing in his ears, as well as nausea. Excedrin did not help. The response states that Plaintiff had "nurse call" on November 15, 2021. Plaintiff reported sickening head pressure, sensitivity to light, fatigue, falling over, and nausea. He was referred to the doctor. (ECF No. 60-1 at 20.)

On November 24, 2021, Plaintiff asked if he could get some steroid eye drops for his eye strain since there was no eye doctor. In response, he was told they would have an eye doctor coming soon, and he would be put on the list. (*Id*. at 19.) On December 2, 2021, Plaintiff sent another kite stating he had been on the list to see the eye doctor for years, but in the interim he needed drops to help with his severe eye strain, light sensitivity, and migraine pressure. The response advised that due to staff availability and equipment under repair, no eye exams were being scheduled. (*Id*. at 18.)

On December 17, 2021, Plaintiff sent a kite that he had so much pressure in his head, it was taking away his ability to know when to go to the bathroom, and to know when he was full from eating. He was also fatigued to the point that he was bedridden daily. (*Id*. at 17.)

Plaintiff saw Dr. Marks on December 20, 2021, who noted that Plaintiff had the same symptoms, including pressure, visual spots and flashes, and continued fatigue that was maybe even more pronounced. Dr. Marks said Plaintiff should have a consultation with an ENT and then a neurologist. (ECF No. 53-1 at 79.)

On February 2, 2022, Plaintiff asked to be put on KOP (keep-on-person) for Sumatriptan[5] because the wait is long, but his migraines and vertigo had become excruciating. The response states this was done. (ECF No. 60-1 at 16.)

Medication administration records from ESP on July 12, 2022, indicate that Plaintiff was to receive Sumatriptan and Excedrin Migraine as KOP once he was discharged from the infirmary. (ECF No. 53-1 at 22.)

---

[5] Sumatriptan is a drug used to treat migraines. *See* Sumatriptan - Search results. Page 1 of about 3098 results (drugs.com), last visited April 6, 2023.

Plaintiff sent a kite on September 20, 2022, stating that he spent the last two months mostly in bed with chronic fatigue, consistent migraines, double/blurred vision, dizziness, and extreme sensitivity to light. He asked to get his blood work checked. The response states that he was referred to Dr. Marks, who ordered labs. (*Id*. at 58.)

A transfer/receiving review form dated November 5, 2022, indicates Plaintiff was transferred on September 13, 2022, and he was taking Sumatriptan and Inderal.[6] His medical problems were listed as: Lyme disease and TBI (presumably referring to a traumatic brain injury). His disposition is listed as "medical housing." (*Id*. at 17.) On November 15, 2022, there is a notation that Plaintiff was received at ESP, and he was listed as having Lyme disease and a TBI. (*Id*. at 79.)

On December 1, 2022, Plaintiff complained of cold/flu symptoms, and requested and was given a "cold pack." (*Id*. at 78.)

On December 13, 2022, Plaintiff had an appointment via Zoom. He complained of daily headaches, pressure and throbbing in his temples, nausea, seeing floaters. He reported to the provider he was hit by a baseball in the yard in 2017 on the left temple and cheek. He had glasses, but was not wearing them. The plan was to start him on Excedrin Migraine for 30 days and set up an appointment with an eye doctor to rule out astigmatism, and he was advised to wear his current prescription glasses. (*Id*. at 77, 82.)

---

[6] Inderal is a beat blocker. *See* Inderal: Uses, Dosage & Side Effects - Drugs.com, last visited April 6, 2023.

16

1   There is a transfer/receiving review dated January 4, 2023, indicating Plaintiff was

2   received at WCC from ESP. It states that he had "no current medical problems," and he was

3   taking Lastacaft[7], Propranolol[8], and Sumatriptan.

4   **c. Analysis**

5   Plaintiff asserts that he has complained for years about symptoms including headaches,

6   migraines, tremors, nausea, dizziness, visual changes and vertigo, but he has not received any

7   effective treatment and his condition has progressed.

8   Defendants argue Plaintiff received proper medical care when he was provided a cold

9   pack on December 1, 2022. As was discussed above in connection with Plaintiff's first motion,

10  Defendants' argument ignores the fact that Plaintiff's medical file is replete with kites and

11  grievances concerning the symptoms that are at issue in this case. So, it is not clear whether

12  defense counsel failed to review the medical records that are consistent with Plaintiff's claims

13  that he has been kiting about these symptoms for years, or whether defense counsel is ignoring

14  the relevant medical records.[9]

15  In any event, the medical evidence before the court demonstrates Plaintiff suffers from

16  serious medical needs, and that Defendants were deliberately indifferent to his serious medical

17  needs. Plaintiff has sent countless kites complaining about his symptoms following his head

18  injury in 2017. As early as June 24, 2020, Dr. Marks ordered a consultation with an ENT, but

19  there is no evidence this treatment ever took place. Plaintiff was given some medications, but

20

21  [7] Lastacaft are antihistamine eye drops. *See* Lastacaft Eye Drops: Uses, Side Effects, Warnings - Drugs.com, last visited April 6, 2023.

22  [8] Propranolol is the generic name for the beta blocker Inderal. *See* Propranolol: Uses, Dosage, Side Effects, Warnings - Drugs.com, last visited April 6, 2023.

23  [9] Either scenario is unacceptable to the court and indicates a lack of professional due diligence by defense counsel in this case.

they were apparently ineffective. There are references to a spinal tap and Lyme disease in the record, with no accompanying explanation, which is consistent with Plaintiff's allegations that he was not informed of the spinal tap results and did not receive any treatment for the Lyme disease. Plaintiff continually complained of eye sensitivity, strain, blurriness and seeing floaters, and at first was told he was on the list to see an eye doctor, only to be informed no eye exams were being scheduled.

When Plaintiff continued to complain of the same and worsening symptoms in December 2021, Dr. Marks again indicated Plaintiff should have a consultation with an ENT, and then a neurologist. There are no records indicating Plaintiff ever saw an ENT or a neurologist.

Defendants submit declarations from officials at WCC to demonstrate Plaintiff was properly classified to live there and that he does not have any medical issues.  Again, this ignores the contents of Plaintiff's medical file for the past several years. It also ignores the fact that two months earlier, Plaintiff was listed as having Lyme disease and a TBI, and his disposition was "medical housing." Moreover, these are not declarations from medical professionals, or anyone who examined and/or treated Plaintiff.

This is not a case of a difference of medical opinion between Plaintiff and his doctors, as Defendants suggest. Dr. Marks himself recommended that Plaintiff see an ENT and neurologist, and Plaintiff is asking for treatment for his head symptoms, including that he see a neurologist. Therefore, the opinions seem to be aligned.

In sum, the medical evidence substantiates Plaintiff's claim that Defendants have been deliberately indifferent to his serious medical needs. Therefore, this factor weighs in favor of injunctive relief.

**2. Likelihood of Suffering Irreparable Harm in the Absence of Injunctive Relief**

Plaintiff asserts that his symptoms have continued over the years, and at times have gotten worse, which is supported by the medical records.

Defendants argue that Plaintiff has no evidence to demonstrate he will be irreparably harmed if he is not provided with the requested care. However, Plaintiff's medical records show that it was recommended that Plaintiff be seen by an ENT and neurologist, but there is no evidence this has occurred. The fact that Dr. Marks recommended these consultations take place completely undercuts Defendants' argument that Plaintiff will not be harmed in the absence of injunctive relief. In other words, under circumstances where recommended medical care has been denied or delayed and the Plaintiff's symptoms continue, the court finds the Plaintiff has demonstrated he is likely to suffer irreparable harm in the absence of injunctive relief.

The court finds that this factor also weighs in favor of injunctive relief.

**3. Balance of Hardships and Public Interest**

The plaintiff must establish the balance of equities tips in his favor. *Winter,* 555 U.S. at 20. "In assessing whether the plaintiff[ ] ha[s] met this burden, the district court has a 'duty … to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

The balance of hardships clearly tips in Plaintiff's favor. If injunctive relief is ordered, Defendants will merely have to do what has already been recommended by Dr. Marks, and Defendants have not identified any harm they will suffer if Plaintiff is granted this relief.

The public also has an interest in seeing that Plaintiff's constitutional rights are not violated, and that Plaintiff receives medical care that his own prison doctor has recommended.

1   Therefore, these factors also weigh in favor of granting injunctive relief.

2   **4. Recommended Relief**

3   It is recommended that a preliminary injunction be entered as follows: Defendants should

4   be required to ensure that Plaintiff sees an NDOC physician at its medical facility at NNCC

5   regarding his condition and symptoms that are the subject of this action within 30 days of any

6   order adopting this Report and Recommendation. Within 60 days of any order adopting this

7   Report and Recommendation, Plaintiff shall have a consultation with both an ENT and a

8   neurologist. The consultations may be with an ENT and neurologist contracted with NDOC,

9   however, if there is no contracted ENT or neurologist, or if the contracted ENT or neurologist is

10  not available within the applicable timeframe, Plaintiff should be seen by an outside ENT or

11  neurologist. Finally, Defendants should be required to file under seal the reports from the

12  appointment with the NNCC physician, the ENT, and the neurologist, within 75 days of the date

13  of any order adopting this Report and Recommendation. Defendants should ensure that his

14  treating physician at NDOC goes over the reports with him, and that he is given an opportunity

15  to review the reports by kiting the warden's office.

16  The court finds that under the circumstances, this relief is narrowly drawn, is the least

17  intrusive means necessary to correct the harm to Plaintiff's rights, and is the constitutional

18  minimum required of Defendants.

19

20

21  ///

22  ///

23  ///

### IV. ORDER & RECOMMENDATION

IT IS HEREBY ORDERED that the Attorney General's Office immediately contact Dr. Adamson regarding this case and file a notice with the court on or before **April 14, 2023** indicating whether it can accept service on Dr. Adamson's behalf. If it does accept service, Dr. Adamson has up to and including **April 28, 2023**, to file his responsive pleading.

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Plaintiff's first motion for a preliminary injunction (ECF No. 38), but **GRANTING** the amended motion for preliminary injunction (ECF No. 47) insofar as the court should issue the following preliminary injunction:

(1) Defendants are required to ensure that Plaintiff sees an NDOC physician at its medical facility at NNCC regarding his condition and symptoms that are the subject of this action **within 30 days of any order adopting this Report and Recommendation**.

(2) **Within 60 days of any order adopting this Report and Recommendation**, Plaintiff shall have a consultation with both an ENT and a neurologist. The consultations may be with an ENT and neurologist contracted with NDOC, however, if there is no contracted ENT or neurologist, or if the contracted ENT or neurologist is not available within the applicable timeframe, Plaintiff should be seen by an outside ENT or neurologist.

(3) Defendants shall file under seal the reports from the appointment with the NNCC physician, the ENT, and the neurologist, **within 75 days of the date of any order adopting this Report and Recommendation**. Defendants shall ensure that Plaintiff's treating physician at NDOC goes over the reports with him, and that he is given an opportunity to review the reports by kiting the warden's office.

///

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: April 7, 2023

_____
Craig S. Denney
United States Magistrate Judge